IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CEDRIC K. KAHUE,                    )   CIVIL NO. 10-00001 LEK-KSC
                                    )
         Plaintiff,                 )
                                    )
    vs.                             )
                                    )
PACIFIC ENVIRONMENTAL               )
CORPORATION, ET AL.,                )
                                    )
         Defendant.                 )
_____    )


**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON COMPLAINT IN INTERVENTION**

          Before the Court are the following motions: (1)

Defendants Pacific Environmental Corporation, M/V PENCO 1, and

M/V PENCO 2's (collectively "Defendants" or "PENCO") Motion for

Summary Judgment ("Motion"), filed on July 19, 2011; and

(2) PENCO's Motion for Summary Judgment on Complaint in

Intervention ("Motion on Complaint in Intervention"), filed on

August 3, 2011.  Plaintiff Cedric Kahue ("Plaintiff" or "Kahue")

filed his memorandum in opposition to the Motion on October 12,

2011, and PENCO filed its reply on October 19, 2011.  Intervenor

Commerce and Industry Insurance Company ("Intervenor" or "CIIC")

filed its memorandum in opposition to the Motion on Complaint in

Intervention on October 12, 2011, and PENCO filed its reply on

October 19, 2011.  These matters came on for hearing on

October 31, 2011.  Appearing on behalf of PENCO was Richard

Wootton, Esq., appearing on behalf of Plaintiff were Cory
Birnberg, Esq., Collin Marty Fritz, Esq., and Allen Williams,
Esq., and appearing on behalf of Intervenor was Lynn Krieger,
Esq.  After careful consideration of the motions, supporting and
opposing memoranda, and the arguments of counsel, PENCO's Motion
is HEREBY GRANTED IN PART and DENIED IN PART – the Motion is
GRANTED as to Plaintiff's Count II claim for unseaworthiness and
DENIED in all other respects – and PENCO's Motion on Complaint in
Intervention is DENIED for the reasons set forth below.

## BACKGROUND

On January 1, 2010, Plaintiff filed a Complaint against
Defendants, seeking recovery under the Jones Act, 46 U.S.C.
§ 30104, for injuries incurred while employed as a seaman by
Defendants.  He alleges that, on June 12, 2008, he was injured
while preparing for a hazardous waste spill response when a large
bale of rags from the second story of a PENCO building fell on
his head.  As a result, Plaintiff is a partial quadriplegic.
[Complaint at ¶¶ 13-14.]  Plaintiff alleges claims for: (1)
negligence (Count I); (2) unseaworthiness (Count II); and (3)
traditional maritime remedies, including maintenance, cure,
found, and wages (Count III).  [Id. at ¶¶ 17-30.]

On April 13, 2011, Intervenor CIIC filed its First
Amended Complaint in Intervention, alleging that it issued an
insurance policy to PENCO against claims under the Longshore and

Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq.

("Longshore Act" or "LHWCA"), under which it paid workers'

compensation benefits to Plaintiff.  [First Amended Complaint in

Intervention at ¶ V.]  Intervenor alleges that it continues to

pay disability compensation and medical expenses for Plaintiff as

a result of the June 12, 2008 injury, and that it is subrogated

to the rights of PENCO and has a lien against any recovery by

Plaintiff in this case.  [Id. at ¶ X.]

## I.   **Defendants' Motion**

Defendants seek summary judgment on all of Plaintiff's

claims on the grounds that Plaintiff may not recover under the

Jones Act because he does not qualify for seaman status, and is

already receiving lifetime benefits under the Longshore Act.

Alternatively, Defendants seek partial summary judgment on

Plaintiff's Count II unseaworthiness claim because no vessel was

involved, and on their affirmative defense to limit liability to

the value of the vessel involved pursuant to 46 U.S.C. § 30501 et

seq.  [Mem. in Supp. of Motion at 1-2.]

PENCO states that it provides environmental remediation

and spill cleanup services, primarily on land, involving

hazardous material and oil spill response operations on roads and

in warehouses, factories, piers, and shipping containers.

[Defendants' Separate and Concise Statement of Facts ("CSF"),

Declaration of Teal Cross ("Cross Decl."), at ¶ 2.]  PENCO also

3

performs soil remediation, oil pumping and processing facilities excavation, above and underground storage tank removal, and hazardous materials disposal.  [Id. at ¶ 3.]

According to Teal Cross, PENCO's Executive Vice President, a small percentage of PENCO's work takes place at sea, including marine spill responses, deploying containment booms around vessels for fueling, and transporting people and equipment to and from jobsites.  [Id. at ¶ 4.]  PENCO's marine operations are conducted primarily from its Boston Whaler, Radon, and three unpowered skiffs; PENCO employees occasionally work on vessels owned by the Clean Islands Council ("CIC"), a customer of PENCO's, and American Marine Corporation ("AMC"), a separate business entity.  [Id. at ¶¶ 7-9; Defendants' CSF, Declaration of Scott Vuillemot ("Vuillemot Decl."), at ¶ 3.]

PENCO states that it hired Plaintiff in 1996 as a laborer, and he later worked as a HAZMAT technician and foreman. [Cross Decl. at ¶ 11.]  According to Mr. Cross, the "vast majority of Plaintiff's work with PENCO was on land jobs operating cranes, backhoes, excavators, dozers, boom trucks, loaders, forklifts and pickup trucks."  [Id. at ¶ 12.]  Plaintiff also worked on or under piers, vessels tied up to piers or in drydock, and on vessels in harbor or at sea.  [Id. at ¶¶ 14-16.] His marine work included operating PENCO's skiffs to place oil containment booms around vessels taking on or discharging fuel,

transporting passengers and equipment, and occasionally, performing oil spill clean up and training.  [Id. at ¶ 18.] Plaintiff also operated and worked aboard skiffs owned and controlled by CIC or AMC's boats.  [Id. at ¶ 19.]  According to Mr. Cross, during Plaintiff's entire employment with PENCO, he spent 14.82% of his time in the service of PENCO's skiffs away from a dock or underway, 2.72% of his time was on vessels owned by AMC, and 2.18% on CIC's and other company's vessels.  [Id. at ¶¶ 23-24.]

Mr. Cross asserts that PENCO is always prepared to respond to land or marine cleanup projects, but that it does not expect its employees to be available for every job arising after normal work hours, and no PENCO employees are on call for service on the skiffs.  [Id. at ¶ 25.]  He claims that PENCO allowed Plaintiff to live at its shop as an accommodation to him, because, in 2003, Plaintiff was evicted from his apartment and began sleeping at the shop without approval.  PENCO purchased a shipping container to be modified as an apartment, which Plaintiff paid for through payroll deductions.  This accommodation was not contingent on Plaintiff being available for work at any time after his regular shift ended.  That is, when off work, PENCO did not require Plaintiff to be at the pier and he was not paid for time spent there.  [Id. at ¶ 26.]

On the date of Plaintiff's injury, Plaintiff was the

foreman in charge of mobilizing equipment and supplies at PENCO's
shop for a highway spill response job in Honolulu.  Plaintiff
ordered two co-workers, James Uyehara and Jarvis Kanakaole, to
load necessary supplies and equipment into a truck.  The supplies
were in a storeroom on the second floor of the shop.  Kahue
testified that he expected his co-workers to carry the supplies
down the stairs, while he waited next to the truck.  Mr. Uyehara,
however, dropped an unopened bale of cleaning rags, weighing
forty to fifty pounds, rather than carrying it down.  No one was
acting as lookout and Mr. Uyehara did not call out a warning.
The bale of rags hit Plaintiff on the head.  Plaintiff agrees
that if proper PENCO procedures for loading supplies were
followed, he would not have been hit in the head.  [Defendants'
CSF, 4/20/11 Deposition of Cedric Kahue ("Kahue Dep."), at 159,
361-376[1].]

A.    **Plaintiff Was Not a Seaman**

        Defendants first argue that Plaintiff's Jones Act claim
fails because he was a land-based worker, not a seaman.  They
contend that Jones Act seamen have traditionally been afforded
heightened protections not available to land-based maritime
workers.  [Mem. in Supp. of Motion at 9 (citing Chandris v.
Latsis, 515 U.S. 347, 354 (1995)).]

---

        [1] The Kahue Deposition is attached as Exh. A to the
Declaration of Richard Wootton ("Wootton Decl.").

6

In order to qualify as a seaman, Plaintiff must both: (1) have an employment related connection to a vessel in navigation on the navigable waters of the United States; and (2) contribute to the function of the vessel or the accomplishment of its mission.  To satisfy the first prong, a seaman must have a connection to a vessel (or group of vessels) that is substantial in terms of both its duration and its nature. [Id. (citing Chandris, 515 U.S. at 354).]

PENCO argues that Plaintiff was not in the service of a vessel at the time of his injury, and spent less than twenty percent of his time on PENCO's marine projects.  It argues that, under Chandris, a worker's service to a vessel is determinative of his status as a seaman, and that a seaman must have an enduring relationship with the vessel.  Even if Plaintiff could show that he otherwise met the duration requirement, he was working on a land-based job at the time of the accident and was not in service of any vessel.  That is, his injury did not arise out of his service to any vessel.  [Id. at 10-11.]

Next, PENCO argues that Plaintiff's work does not satisfy the duration element of the substantial connection test, which requires that roughly thirty percent of a worker's time be spent in service of a vessel in navigation.  Here, Plaintiff spent only 14.82% of his time in service of PENCO's vessels.  The duration element is proper on summary judgment because, "where

7

undisputed facts reveal that a maritime worker has a clearly

inadequate temporal connection to vessels in navigation, the

court may take the question from the jury by granting summary

judgment." [<u>Id.</u> at 14 (quoting <u>Chandris</u>, 515 U.S. at 371).]

PENCO also argues that Plaintiff's unseaworthiness,

maintenance, and cure claims fail because he is not a seaman.  It

notes that unseaworthiness is a form of strict liability unique

to maritime law, but that a vessel owner owes a duty only to

seamen working aboard its vessel to ensure that it is seaworthy.

A seaman is also entitled to recover "maintenance and cure" in

the event he is injured in service of a ship; this right is also

limited to seamen.  Plaintiff is not a seaman, and cannot

maintain his claim for unseaworthiness, maintenance, and cure.

[<u>Id.</u> at 17.]

> **B.** **Partial Summary Judgment on Count II (Unseaworthiness)**

Alternatively, PENCO seeks partial summary judgment on

Plaintiff's unseaworthiness claim.  It argues that Plaintiff was

not injured by a vessel, let alone an unseaworthy one.  Here,

Plaintiff was injured while supervising the loading of a truck

with supplies to clean up a roadside oil spill – there is no

vessel that was a substantial factor in causing his injury.

PENCO argues that there is no legal or factual basis for

Plaintiff's Count II unseaworthiness claim, and that it is

entitled to summary judgment on that claim.  [<u>Id.</u> at 18.]

**C.   <u>Partial Summary Judgment as to Limitation of Liability</u>**

PENCO also seeks partial summary judgment based on its affirmative defense of limited liability under the Limitation Act.  It argues that the Limitation Act's language is very general, permitting limitation for "any act . . . done, occasioned, or incurred, without privity or knowledge of the matter."  [<u>Id.</u> at 10 (quoting 46 U.S.C. § 30505).]  PENCO asserts that there is no evidence that it had any privity and knowledge that its employees would violate safety procedures, and, barring such evidence, PENCO is entitled to limit its liability under the Limitation Act.  [<u>Id.</u>]

**II.   <u>Plaintiff's Memorandum in Opposition</u>**

**A.   <u>Plaintiff Is a Seaman</u>**

In his memorandum in opposition, Plaintiff argues that he is a Jones Act seaman, and that this determination is a mixed question of law and fact, which is for the trier of fact and not appropriate for summary judgment.  [Mem. in Opp. to Motion at 2-3.]

Plaintiff argues that, under the <u>Chandris</u> test, the term "seaman" is to be liberally construed.  Plaintiff argues that he is a seaman because he meets the following four factors: (1) he contributed to the function of, or helped accomplish the mission of, a vessel; (2) his contribution was to a particular vessel or identifiable group of vessels; (3) his contribution was

9

substantial in terms of the duration and nature; and (4) his employment regularly exposed him to the hazards of the sea.  [Id. at 4-5.]

First, he argues that the definition of "vessel" is broad, and that a vessel need not be out to sea.  He argues that all of the vessels he used during his employment at PENCO should be considered in determining seaman status regardless of whether they were in the harbor or the open ocean, including paddleboards, jet skis, skiffs, dinghies, Boston Whalers, Radons, and Livingstons.  [Id. at 6.]

Second, Plaintiff argues that his duties contributed to the function of the vessel, and that he need not have aided in navigation.  He argues that all "who work at sea in service of the ship" are eligible for seaman status, and that this threshold is very broad.  [Id. at 7.]

Third, Plaintiff maintains that he was in service to an identifiable group of vessels, including other entities' vessels. According to Plaintiff, "[i]n service, of course, includes operations of the vessel but the term is much broader than simply being on board and/or operating the vessel.  To be in service of a vessel, one is 'answerable to the call of duty.'  This would include being on call."  [Id. at 9.]  He argues that, because PENCO was a "24/7 emergency marine response company," its employees were subject to being called in, especially Plaintiff,

10

as he was living at the facility and "was effectively on duty 24/7 365 days a year." [Id.]

Plaintiff argues that "in service of a vessel, would necessarily include prepping, repairing, and routine maintenance of the vessel." [Id. at 10.] He also states that the requirement is that the employee be in service of the vessel, not actually on the vessel. In Defendants' calculations of the amount of Jones Act time Plaintiff spent, the time considered was incorrectly limited to his time spent on the vessel in the water and away from the dock. Plaintiff urges the Court to consider his time spent in service of all PENCO, CIC, and AMC vessels in determining his seaman status. [Id. at 10-13.]

Fourth, Plaintiff claims that his contribution was substantial in terms of duration and nature. Plaintiff's own statistical analysis of the documents produced indicate more than fifty-five percent of Plaintiff's time was in service of a vessel for the three years prior to his injury. [Id. at 15 (citing Plaintiff's Concise Statement of Facts in Opposition ("CSF"), Declaration of Amy Chan ("Chan Decl."), passim).] Plaintiff also states that "all of the witnesses that have been deposed, that were asked about Plaintiff's work, felt that Plaintiff's time was at least 70% or more on the water." [Id. (citing Plaintiff's CSF, Saito Decl., at ¶¶ 17, 21, 24-26, 29, 31, 32, 46; Uyehara Decl., at ¶¶ 8, 11, 13, 14, 20, 30, 33; Birnberg Decl. ¶¶ 3, 4,

10; Kaumeheiwa Decl. ¶ 5).]  Plaintiff argues that Defendants'
calculations are deficient and applied an incorrect (and very
narrow) interpretation of what constitutes Jones Act work,
omitting, for example, all of Plaintiff's time spent prepping,
maintaining, and repairing the vessels.  Plaintiff's time on call
was also not included.  There were also numerous discrepancies
and errors in Mr. Cross's calculations.  Plaintiff argues that
his time in service of a vessel is an issue of fact and that
summary judgment is not appropriate.  [Id. at 16.]

Finally, Plaintiff argues that whether he was exposed
to the "perils of the sea" is not determinative of seaman status,
but, that, in any event, he was so exposed.  Risks encountered by
Plaintiff included failing overboard, drowning, and being exposed
to dangerous marine life.  [Id. at 17-18.]

With respect to the type of job Plaintiff was reporting
for on the day of his injury, he claims that there is no basis to
claim that Plaintiff would even have gone on the "land based job"
that day.  Plaintiff testified that he did not know what type of
job he was preparing for (rags are used for both land based and
marine based jobs).  [Id. at 19 (citing Plaintiff's CSF,
Declaration of Cedric Kahue ("Kahue Decl."), at ¶ 25).]  He
argues that the fact that his injury occurred on land does not
deprive him of seaman status.

**B.   Defendants' Insurance Coverage and Seaman Status**

Plaintiff next argues that PENCO is a Jones Act Employer, specifically taking out Jones Act insurance to cover its employees, not only in the service of its own vessels, but in the service of its customers' vessels (and the vessels of its sister organization AMC), without reference to a time percentage or assignment to a specific identifiable vessel or group of vessels.  He states that PENCO has marine Protection and Indemnity ("P&I") insurance, which specifically includes Jones Act seaman coverage for employees on vessels and other non-PENCO owned vessels.  [Id. at 23-24 (citing Plaintiff's CSF, Declaration of Cory Birnberg ("Birnberg Decl."), at ¶¶ 3, 7).] Plaintiff argues that PENCO's insurance coverage is indicative of his seaman status.  [Id. at 24-25.]

**C.   PENCO Is Not a Land-Based Company**

According to Plaintiff, PENCO is not simply a land-based company.  PENCO's website touts its history and services as marine-based, and, through its insurance coverage, workers' compensation type benefits are being provided to Plaintiff as a "maritime worker" under the Longshore Act.  [Id. at 25 (citing Birnberg Decl. ¶ 2 and Exh. A attached thereto (Website print outs)).]

**D.   Limitation of Liability Is Not Applicable**

With respect to PENCO's affirmative defense under the

13

Limitation Act, Plaintiff argues that PENCO's skiffs are excluded under the law.  He states that it is applicable **"_only_** to seagoing vessels, but does not apply to pleasure yachts, tugs, towboats, towing vessels, tank vessels, fishing vessels, fish tender vessels, canal boats, scows, car floats, barges, lighters, or nondescript vessels."  [_Id._ at 26 (quoting 46 U.S.C. §30506(a)) (emphasis Plaintiff's).]

Plaintiff argues that a vessel owner cannot limit liability if the unseaworthy condition or negligent act was within its privity and knowledge.  He states that Justin Souza, supervisor, on site, informed Plaintiff to get ready for a spill. [_Id._ at 27 (citing Defendants' CSF ¶ 28).]  If the vessel owner or management is on the vessel, knowledge is presumed as it is something they knew or should have known.  Plaintiff asserts that 46 U.S.C. §§ 30505 and 30506 state that a ship owner may limit liability for actions arising from personal injury or death only if the ship owner did not have privity or knowledge of the negligence or unseaworthiness responsible for the loss. Supervisors and Vice President Justin Souza and Dave Carter were present at the time of the Plaintiff's injury.  Ruben Sabog and Jacob Darakjaian were Plaintiff's supervisors and present and instructing Plaintiff as to the emergency response.  The report of injury specifically says management was at fault for the accident and caused Plaintiff to hurry.  [_Id._ at 28 (citing

14

Birnberg Decl., at ¶ 16 and Exh. N attached thereto (Cross Dep. 82:15-16)).]  Plaintiff argues that limitation is not allowed or is a triable issue of fact as to Defendants' privity and knowledge.

      **E.**    **Defendants Are Answerable for Unseaworthiness**

        With respect to Count II, Plaintiff argues that "it is a settled rule than a seaman who is not equal in disposition and seamanship to the ordinary men in the calling makes the vessel unseaworthy and visits liability on the ship or her owner."  [Id. at 29.]  In this case, Plaintiff argues that Mr. Uyehara, the person who threw the bag of rags on Plaintiff's head, was not fit to be a seaman.  "No one throws a heavy bundle from a second story without looking or having appropriate safety rules."  [Id.]  Further, PENCO failed to have proper safety rules for its vessels, its loading and unloading equipment, and supplies for its vessels were stored in the second story mezzanine.  He argues that Mr. Uyehara did not have the proper training and the rules for him were not defined.  Thus, Defendants are liable for his unseaworthiness.  [Id. (citing Scindia Steam Navigation Co. v. Moon Engineering Co., 379 F.2d 928 (3rd. Cir. 1967) ("a supervisor must not assume that a safe condition exists when he has notice that such may not be the case")).]

**III. Defendants' Reply**

        Defendants argue in reply that Plaintiff was not in

service of a vessel, was not a seaman, and that summary judgment is proper here.

A.   **Plaintiff Was Not In Service of a Vessel**

PENCO argues that a seaman injured on shore is only entitled to pursue seaman's remedies if he was in the service of the vessel at the time of his accident, which precludes Plaintiff from recovering under the Jones Act here.  Further, even if Plaintiff could prove seaman status, he was not in the service of any vessel at the time of the accident.  It is his service to the vessel, not the mere fact of his employment, which entitles a seaman to Jones Act protection when injured on shore.  [Reply at 3-4.]  PENCO distinguishes the instant facts from cases in which "blue water seamen" are injured ashore.  Blue water seamen who sign seaman's articles are contractually and statutorily bound to the vessel during the entirety of the voyage, and retain their seaman status when injured ashore.  [Id. at 5 (citing cases).]

B.   **Plaintiff Was Not a Seaman**

PENCO argues that Plaintiff does not qualify for seaman status as a result of his overall employment with PENCO, and he does not satisfy the duration element of the Chandris substantial connection test.  PENCO maintains that only Mr. Cross has properly analyzed Plaintiff's day-to-day work records, and he was the only person with a clear understanding of how to interpret them because the knew all the jobs, the timekeeping system, had

16

performed all the work himself, and knew what Plaintiff's assignments were.  Mr. Cross agreed at his deposition that certain entries in PENCO's Timberline accounting system were miscoded, and he also explained how he checked these to ensure that his calculations were accurate.  [Id. at 9 (citing Wootton Decl., at ¶ 4 and Exh. C attached thereto (Cross Dep.)).]

### C.   Duration Element and Time Spent in Service of Vessel

PENCO argues that time spent in the service of a vessel does not count toward the duration element if the plaintiff is not aboard a vessel.  That is because time spent in the service of a vessel is the same as time spent doing Jones Act work.  The case law mandates that a worker who divides time between the shore and vessel "must demonstrate that he spends a substantial part of his work time aboard the vessel in order to demonstrate that he has the requisite connection to a vessel in order to qualify as a seaman."  [Id. at 10 (quoting Nunez v. B&B Dredging, Inc., 288 F.3d 271, 277 (5th Cir. 2002)).]  Defendants argue that none of the cases cited by Plaintiff supports his proposition that all time spent by a purported seaman in the service of a vessel, whether on land or sea, counts toward the thirty percent seaman status threshold.  [Id. at 10-11.]

### D.   Plaintiff's Other Arguments in Opposition

With respect to Plaintiff's arguments regarding PENCO's P&I insurance, PENCO argues that such coverage does not establish

that it employs seaman.   Rather, all it shows is PENCO's recognition that a plaintiff might bring such a suit.   By Plaintiff's logic, that PENCO also carries Longshore coverage and has paid out benefits thereunder establishes that Plaintiff was a harbor worker, not a seaman.   [Id. at 14.]

With respect to Plaintiff's unseaworthiness claim, PENCO argues that his opposition cites no cases indicating that one can have a viable unseaworthiness claim without a vessel. With respect to the Limitation Act, Plaintiff's contention that PENCO didn't have an established safety procedure for lowering supplies from the loft to the floor is contrary to Plaintiff's own testimony.   PENCO argues that the accident was due to Mr. Uyehara's unanticipated violation of an established safety protocol.   [Id. at 14-15.]

## IV.   Defendants' Motion on the Complaint in Intervention

The second matter before the Court is PENCO's Motion on Complaint in Intervention.   It states that CIIC investigated the matter, concluded that Plaintiff was a harbor worker, and paid and continues to pay the benefits to which he is entitled pursuant to the Longshore Act.   CIIC has intervened in this action to recover those payments from PENCO, but PENCO claims that CIIC's lien and subrogation claim are legally deficient because there is no third party against whom CIIC can bring its subrogation claim.   [Mem. in Supp. of Motion on Complaint in

Intervention at 2.]

A.  **Intervenor Has No Right of Recovery**

According to PENCO, CIIC has no subrogation rights here because PENCO cannot sue itself.  It argues that CIIC's Complaint in Intervention seeks recovery pursuant to 33 U.S.C. § 933, but that section only applies when a person other than the employer is liable for damages.  PENCO asserts that the statute "preserves a compensated worker's right to recover damages *from parties other than his employer*."  [Id. at 4 (quoting Peters v. North River Ins. Co. of Morristown, New Jersey, 764 F.2d 306, 310 (5th Cir. 1985)) (emphasis Defendants').]  According to PENCO, an employer would never sue itself to recover payments for Longshore benefits made to its employee, nor could it because the employee's rights assigned to the employer only permit its suit of a third person responsible for the injury to the employee. [Id.]

Under § 933(d), after an assignment to the employer pursuant to § 933(b), an employer may institute proceedings or may "compromise with such third person[.]"  Section 933(g)(1)(2) requires a person entitled to compensation who enters into a settlement with a third person to seek approval from the employer and the employer's carrier, and that person's failure to notify the employer of any settlement or judgment rendered against a third person terminates his or her right to Longshore

19

compensation and benefits.  PENCO argues that, what is missing in § 933 is any mention of what CIIC claims it is entitled to here; that is, Congress did not expressly provide that a Longshore insurer may sue its insured employer to recover the Longshore benefits paid to one of its employees.  [Id. at 5-6.]  It claims that, as a matter of law, CIIC has no right of recovery under § 933 against PENCO and summary judgment is proper.

### B.    **Affect of the Longshore Act**

PENCO posits that § 905(b) of the Longshore Act does not change the above analysis.  PENCO anticipates that CIIC will argue that an employer can indeed be a third person vis a vis an injured employee covered by the Longshore Act, which may be technically true, but does not change the outcome here.

### V.    **Intervenor's Memorandum in Opposition**

Intervenor argues that PENCO's motion is an attempt to prevent the Longshore carrier from interfering with its Jones Act carrier's ability to achieve a favorable settlement.  It states that it has paid nearly one million dollars in ongoing compensation and benefits to Plaintiff, and that it has a right to recover the benefits it paid in the event Plaintiff receives either an award or settlement in this action.  It argues that the Jones Act carrier has paid nothing to Plaintiff, yet – through its insured, PENCO – asserts that in the event Plaintiff receives money through his efforts in prosecuting this action, the

Longshore carrier has no right to reimbursement for compensation and benefits it paid and may continue to pay – at least not by virtue of intervening in this action.  [Mem. in Opp. to Motion on Complaint in Intervention at 2.]

A.    **Amended Complaint in Intervention**

CIIC first argues that the Court's order granting it leave to file a complaint in intervention precludes PENCO from relitigating the question of whether the carrier is entitled to maintain its complaint in intervention.  On December 15, 2010, the magistrate judge issued an order that CIIC could intervene in this suit in order to "protect its rights to any recovery Plaintiff may obtain in this case."  [Id. at 6 (quoting Order Granting Proposed Intervenor Insurance Company of the State of Pennsylvania's Motion for Order Granting Leave to Intervene, filed 12/15/10 (dkt. no. 39), at 12).]  It states that the court based its findings on the fact that CIIC was intervening in order to enforce its lien rights once Plaintiff received a settlement or award.  CIIC argues that the magistrate judge's findings are at the heart of what PENCO now seeks to reargue.  [Id.]

It characterizes PENCO's motion as arguing that the complaint in intervention was filed against PENCO.  CIIC asserts that it did not sue PENCO, or bring any claims against PENCO, and that there can be no issues in dispute between PENCO and itself. CIIC argues that the law of the case doctrine prevents PENCO from

rearguing this issue, and from rearguing the propriety of the intervention itself. [Id. at 6.]

Intervenor argues that the issue of whether it, by intervening in this action, was "suing itself" was explicitly decided by the court.  Plaintiff opposed the motion to intervene on the same issue PENCO is now raising.  Specifically, Plaintiff argued that:

> In Section X, proposed Intervenor claims it "has become subrogated to all of the rights of PEC [Defendants], and against any third party who is or may be liable to the plaintiff on account of his injuries. . ."  However, "any third party" is in fact the Defendants, PEC.  Thus, Proposed Intervenor is claiming all of the rights of PEC against PEC.  Such a circular claim makes intervention unduly complicated when Proposed Intervenor can simply assert its lien as a Lien Claimant.

[Id. at 7 (quoting Plaintiff's Opposition to COMMERCE AND INDUSTRY INSURANCE COMPANY'S Motion, at 11-12, Nov. 22, 2010, attached as Exh. 5 to Declaration of Lynn Kreiger ("Kreiger Decl.")).]  According to Intervenor, after full briefing on this issue, the magistrate judge found that by intervening, CIIC was not suing itself, but rather intervening in the case for the sole purpose of protecting the recovery rights that would arise against Plaintiff's settlement or award.

Intervenor argues that PENCO's motion improperly reargues that it seeks to enforce its rights against PENCO, and that consequently, it does not have the right to intervene.  It

argues that this Court has already decided this issue and PENCO's motion should be denied.  [Id.]

**B.   Effect of 33 U.S.C. § 933**

CIIC next argues that PENCO's "literal" reading of 33 U.S.C. § 933 is unsupported by law.  It argues that these sections allow the Longshore carrier (which is subrogated to the rights of PENCO as a Longshore employer) to recover its lien for compensation paid.  [Id. at 8-9.]

CIIC cites Peters v. North River Insurance Co., 764 F.2d 306, 312-13 (5th Cir. 1985), stating that the Fifth Circuit noted that, while the Longshore employer's liability is exclusive and without fault, the Longshore employer's remedy of subrogation is not, and an employer "is free to assert whatever independent causes of action against third parties that may exist under applicable law."  [Id. at 10.]

**C.   Single Employer Can Fill Two Rolls**

Intervenor next argues that the treatment of a single employer as filling two distinct roles is not a novel concept; the right to reimbursement and the prohibition on double recovery remain unchanged.  It states that cases in which the injured worker reimburses the Longshore carrier after receiving an award or settlement are not limited to situations involving third-party, non-employer defendants.  Intervenor argues that § 905(b) was created in order to give a claimant the opportunity to

23

sue his employer civilly if his employer also happened to own the vessel on which the longshoreman was injured.   The creation of this section alone indicates the recognition that an employer can wear two different hats.   [Id. at 11.]

It cites Bundens v. J.E. Brenneman Co., 46 F.3d 292 (3rd Cir. 1995), which addressed the same argument raised by PENCO here, wherein the plaintiffs argued that the dual-capacity employer could not be a "third person" within the meaning of § 933(f).   Intervenor cites Bundens' statement that:

> We believe that the only meaningful interpretation of § 933(f) is to treat the employer as a third party whenever the employee recovers funds from the employer in other legal proceedings.   Section 933(f), as set forth above, indicates that an employer only has to pay compensation benefits to the "person entitled to compensation" ("PETC") when the amount of the benefits to which the PETC is entitled under the LHWCA exceeds the net amount of money that the PETC has recovered from a third party.   If the employer/vessel owner is a third party, then any monies paid by the employer in the negligence suit can be used to offset the monies owed the PETC under the LHWCA.   If the employer/vessel owner is not considered to be a third party under § 933(f), then the employer is prohibited from deducting monies already paid.

[Id. at 13 (quoting 46 F.3d at 303).]

According to Intervenor, the only case PENCO cites in support of its argument is inapplicable, and PENCO acknowledges it is "not directly on point."   Intervenor argues that Johnson v. American Mutual Liability Insurance Co., 559 F.2d 382 (5th Cir. 1977), was not at all on point.   It states that Johnson was a

24

case in which the injured plaintiff attempted to sue the

employer's Longshore carrier directly, for negligence in failing

to properly inspect and control the safety program at the

plaintiff's place of work.  Summary judgment was affirmed in

favor of the Longshore carrier because the court found that the

compensation carrier's inspections of the premises were made

pursuant to its contract of insurance with the employer, only for

purposes of determining compliance with the insurance contract.

The inspections were merely "adjunct" to the contract and largely

for underwriting purposes.  The Longshore carrier could not,

therefore, be held directly liable to the plaintiff for any

injuries caused by his employer's safety violations.  Intervenor

asserts that <u>Johnson</u> was not a case against the employer for

negligence under the Longshore Act – it was a case for general

negligence against an insurance carrier.  It also was not a

case in which the court was examining a "dual-capacity" employer

under section 905(b) of the Longshore Act.  The Fifth Circuit in

<u>Johnson</u> distinguished this situation from that of a dual-capacity

employer, explaining: "This problem [of bringing the compensation

carrier into the group of 'third person[s]' who may be liable for

damages as distinguished from compensation] is not satisfactorily

explained away by saying in effect that when the carrier sues

itself, it, as defendant, can grant a set-off against itself as

plaintiff for the amount of compensation paid, thus preventing a

double recovery." [Id. at 14-15 (quoting Johnson, 559 F.2d at 390).]

Intervenor maintains that, where the same employer is liable in two different capacities, and is insured by two different carriers, the Longshore carrier is simply reimbursed from the award or settlement paid by the Jones Act carrier in the civil matter. [Id. at 15.]

### D.   **Intervenor Does Not Seek Recovery From PENCO**

Intervenor next argues that PENCO's claim that the complaint in intervention seeks a recovery against PENCO is inaccurate. First, neither the original Complaint in Intervention nor the First Amended Complaint in Intervention states any cause of action against PENCO. The prayer for relief states only:

> That it be adjudged that Intervenor has a lien against any recovery by plaintiff in this case, either by way of judgment or settlement, to the extent of all payments made to and on behalf of said plaintiff by Intervenor herein under the Longshore and Harbor Workers' Compensation Act, according to proof, and that such lien shall be enforced against the proceeds of any such settlement or judgment herein[.]

[Id. at 15 (quoting First Amended Complaint in Intervention at 5).]

Second, Intervenor argues that, at no point in the ongoing litigation of this case has it attempted to prosecute its claims against any of the parties. It argues it has, consistent

26

with its position in the pleadings, refrained from taking a position on, or attempting to affect, liability. [Id. at 15-16.]

## VI. Defendants' Reply

PENCO argues in reply that it is not a "third person" in relation to CIIC; that is, an employer is not a "third person" in relation to its own insurer under § 933. PENCO asserts that CIIC's intervention is not necessary to prevent a double recovery by Plaintiff, but, rather, CIIC is seeking to recover from PENCO the benefits that it paid on behalf of PENCO. [Reply to Motion on Complaint in Intervention at 1.]

### A. PENCO Is Not a Third Person In Relation to CIIC

PENCO argues that, as between an employee and employer, an employer can bear "third party" liability to the employee by having a "dual capacity," with responsibility to the employee for the payment of workers' compensation, and potential civil liability under 33 U.S.C. § 905(b) for the same accident "in a capacity as a third-party vessel owner." [Id. at 2.] In such cases, the employee may treat the employer as if it were a third party to the employment relationship, however, there is no legal authority allowing the employer to be treated as a "third person" relative to its own insurer in a Jones Act suit such as this. [Id. at 3.]

### B. PENCO Did Not Waive Its Right to Bring This Motion

Finally, PENCO argues that, rather than admit the

27

allegations in CIIC's complaint in intervention, it filed an answer specifically denying all material allegations, and setting out affirmative defenses.  It argues that it did not waived its ability to file the instant motion for summary judgment by not opposing CIIC's motion to intervene.  PENCO states that, if CIIC's argument were correct, a defendant filing an answer, rather than first filing a motion to dismiss, would waive its ability to later challenge the allegations in the complaint by summary judgment motion.  It argues that there is no legal support for CIIC's position that PENCO must have opposed the motion to intervene as a prerequisite to PENCO challenging the allegations contained in the complaint in intervention with this motion for summary judgment.

### STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

> Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex [Corp. v. Catrett], 477 U.S. [317,] 323 [(1986)].  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of

28

any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller [v. Glenn Miller Prods., Inc.], 454 F.3d [975,] 987 [(9th Cir. 2006)].

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

Rodriquez v. Gen. Dynamics Armament & Technical Prods., Inc., 696

F. Supp. 2d 1163, 1176 (D. Hawai`i 2010) (some citations

omitted).

## DISCUSSION

### I.   Defendants' Motion

The Court first addresses two preliminary matters
raised in Plaintiff's "Evidentiary Objections in Opposition to
Motion for Summary Judgment" [dkt. no. 163,] and a request for
judicial notice [dkt. no. 164].  First, to the extent Plaintiff
objects to the admissibility of the Declaration of Teal Cross and
argues that Mr. Cross's factual allegations must be excluded, the
Court overrules the objections.  The Court FINDS that the
Declaration satisfies Rule 56(c)(4) of the Federal Rules of Civil
Procedure, formerly Rule 56(e)(1), which requires affidavits and
declarations supporting or opposing a motion for summary judgment
to "be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant is
competent to testify on the matters stated."

Second, Plaintiff requests that the Court take judicial
notice, pursuant to Fed. R. Evid. 201, of his Exhibits A through
D, which include: (1) Brief for Respondent in Southwest Marine,
Inc. v. Byron Gizoni, 502 U.S. 81 (1991) (Exhibit A); (2) Amicus
Curiae Brief of the United States in Support of Respondent in
Southwest Marine, Inc. (Exhibit B); (3) Amicus Curiae Brief of
United Brotherhood of Carpenters and Joiners in Support of
Respondent in Southwest Marine, Inc. (Exhibit C); and Excerpts

from the Deposition of Cedric K. Kahue taken on June 3, 2010, in the longshore action <u>Kahue (Claimant) v. Pacific Environmental Corp (Employer) and Insurance Company of the State of Pennsylvania1 (Carrier)</u> [now known as CIIC], OALJ Case No. 2010-LHC-00361; OWCP No. 15-050918 (Exhibit D).

This district court has recognized that:

> This court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." <u>United States ex rel. Robinson Rancheria Citizens Council v. Borneo</u>, Inc., 971 F.2d 244, 248 (9th Cir. 1992). A court may also take judicial notice of the existence of matters of public record, such as a prior order or decision, but not the truth of the facts cited therein. <u>See Lee v. City of Los Angeles</u>, 250 F.3d 668, 689-690 (9th Cir. 2001); <u>see also Interstate Natural Gas Co. v. Southern California Gas Co.</u>, 209 F.2d 380, 385 (9th Cir. 1953) (holding a court may take judicial notice of records and reports of administrative bodies).

<u>Finley v. Rivas</u>, CV 10-00421 DAE-LEK, 2010 WL 3001915, at *2 n.2 (D. Hawai'i July 31, 2010).

Plaintiff, however, does not appear to rely on the proffered legal briefs or deposition excerpt for any "adjudicative facts" contained therein; rather, they support Plaintiff's legal arguments. To the extent that Plaintiff does not ask the Court to take judicial notice of "adjudicative facts," as provided for by Rule Fed. R. Evid. 201(a), the request for judicial notice is DENIED. Although it need not take judicial notice of any facts set forth in these documents, the

Court has reviewed and considered the substance of Plaintiff's Exhibits A-D in ruling on the Motion.  The Court next turns to the merits of PENCO's Motion.

**A.**   **The Motion Is Denied as to Plaintiff's Seaman Status**

PENCO first moves for summary judgment on the grounds that Plaintiff is not a Jones Act seaman.

> The Jones Act provides a cause of action for any seaman "injured in the course of employment". 46 U.S.C. § 30104.  Section 30104 provides, in pertinent part, that "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer."

> "The determination of who is a seaman is a mixed question of fact and law."  Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 785 (9th Cir. 2007) (citing Chandris, Inc. v. Latsis, 515 U.S. 347, 369, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995)).  As the Ninth Circuit explained in Scheuring:

>> In Chandris, the Court articulated a two-part test which drew on its holdings in earlier cases:

>>> [T]he essential requirements for seaman status are twofold.  First, as we emphasized in [McDermott Int'l, Inc. v.] Wilander, [498 U.S. 337 (1991),] "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" . . . Second, . . . a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and its nature.

>> Chandris, 515 U.S. at 368, 115 S. Ct. 2172

(citations omitted). . . .

As the Supreme Court explained in Chandris, the first part of the requirement is very broad, covering "'[a]ll who work at sea in the service of a ship.'" Id. (quoting Wilander, 498 U.S. at 354, 111 S. Ct. 807). The second requirement, on the other hand, narrows the pool of potential seaman

> in order to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

Id.  The Court explained that this test is "fundamentally status based." Id. at 361, 115 S. Ct. 2172.  "Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." Id. The Court also equated the question of who is a "seaman" to the determination of who is a "member of a crew." Id. at 356, 115 S. Ct. 2172.  Decided two years later, Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 117 S. Ct. 1535, 137 L. Ed. 2d 800 (1997), provides additional guidance on the substantial connection prong of the test articulated in Chandris.

> For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea.  This will give substance to the inquiry both as to the duration and nature of the employee's connection to the vessel and be helpful

> in distinguishing land-based from sea-based employees.
>
> Papai, 520 U.S. at 555, 117 S. Ct. 1535.  The crux of the second prong of the "seaman" test involves distinguishing land-based from sea-based employees by examining the employee's activities and duties.

Id. at 785-86 (some alterations in original).

> A "rule of thumb" for determining seaman status is that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." Chandris, 515 U.S. at 371.  The Supreme Court cautioned, however, that the thirty-percent rule of thumb "serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases." Id.

Nguyen v. Nguyen, Civil No. 10-00320 LEK-RLP, 2011 WL 3793344, at *5-6  (D. Hawai'i Aug. 24, 2011).

As to the first prong, the Court FINDS that PENCO has not met its burden of establishing that Plaintiff did not have a connection to a vessel.  Plaintiff presented evidence that he had a connection to PENCO's and other vessels (Boston Whalers, a skiff or small boat that ferried him out to sea, and jet skis, as well as vessels involved in marine clean up), and he contributed to the accomplishment of the vessels' mission, namely, marine clean up.  According to PENCO, Plaintiff worked on or under piers, vessels tied up to piers or in drydock, and on vessels in harbor or at sea.  [Cross Decl. at ¶¶ 14-16.]  His marine work included operating PENCO's skiffs to place oil containment booms

34

around vessels taking on or discharging fuel, transporting passengers and equipment, and occasionally, performing oil spill clean up and training.  [Id. at ¶ 18.]  Plaintiff also operated and worked aboard skiffs owned and controlled by CIC or AMC's boats.  [Id. at ¶ 19.]  For purposes of summary judgment, and based on the current record, PENCO has not established that Plaintiff did not "contribut[e] to the function of the vessel or to the accomplishment of its mission."  Chandris, 515 U.S. at 368.

As to the second prong, whether his connection to the vessel was substantial in duration, the Court FINDS that there is a question of fact as to this material issue, and, therefore, summary judgment is not appropriate.  The parties presented entirely contradictory evidence on the duration and nature of Plaintiff's duties, work done in the past, and his responsibility to be available for work on an emergency basis.  For example, according to Mr. Cross, during Plaintiff's entire employment with PENCO, he spent 14.82% of his time in the service of PENCO's skiffs away from a dock or underway, 2.72% of his time was on vessels owned by AMC, and 2.18% on CIC's and other company's vessels.  [Cross Decl. at ¶¶ 23-24.]  Plaintiff argues that Defendants' calculations are incorrect and omitted all of Plaintiff's time spent prepping, maintaining, and repairing the vessels, and Plaintiff's time on call.  Plaintiff's own

statistical analysis shows that more than fifty-five percent of Plaintiff's time was in service of a vessel, for the three years prior to his injury. [Mem. in Opp. at 15 (citing Plaintiff's CSF, Chan Decl., <u>passim</u>).]  Further, "all of the witnesses that have been deposed, that were asked about Plaintiff's work, felt that Plaintiff's time was at least 70% or more on the water." [<u>Id.</u> (citing Plaintiff's CSF, Saito Decl., at ¶¶ 17, 21, 24-26, 29, 31, 32, 46; Uyehara Decl., at ¶¶ 8, 11, 13, 14, 20, 30, 33; Birnberg Decl. ¶¶ 3, 4, 10; Kaumeheiwa Decl. ¶ 5).]

    For purposes of summary judgment, and viewing the evidence in the light most favorable to the non-moving party, PENCO has not established as a matter of law that Plaintiff did not have a connection to a vessel in navigation that is substantial in terms of both duration and its nature.  The Motion is DENIED as to this issue.

    B.    <u>**The Motion Is Granted as to Count II (Unseaworthiness)**</u>

    PENCO also moves for summary judgment on Plaintiff's Count II claim for unseaworthiness.

        The admiralty doctrine of unseaworthiness is
    a form of strict liability that requires the owner
    of a vessel to ensure that a vessel and its
    appurtenant equipment and appliances are
    "reasonably fit for her intended service." <u>Usner
    v. Luckenbach Overseas Corp.</u>, 400 U.S. 494, 499
    (1971); <u>see also</u> <u>Seas Shipping Co. v. Sieracki</u>,
    328 U.S. 85, 90 (1946).  Although the origins of
    the unseaworthiness doctrine are "perhaps
    unascertainable," <u>Sieracki</u>, 328 U.S. at 91, the
    doctrine likely developed from the seaman's right
    to abandon an improperly fitted vessel. <u>Arizona</u>

> v. Anelich, 298 U.S. 110, 121, n.2 (1936).  The
> doctrine appears to have been established in the
> late nineteenth century as a response to the
> increased danger seamen faced aboard more modern
> vessels.  See Sieracki, 328 U.S. at 92 n.9 ("With
> the advent of steam navigation, however, it was
> realized . . . that 'maintenance and cure' did not
> afford to injured seamen adequate compensation in
> all cases for injuries sustained."  (citing The
> State of Maryland, 85 F.2d 944, 945 (4th Cir.
> 1936))); see also Mahnich v. S.S.S. Co., 321 U.S.
> 96, 99 (1944) ("[Unseaworthiness] was generally
> applied, before its statement in [The Osceola, 189
> U.S. 158, 171 (1903),] by numerous decisions of
> the lower federal courts during the last
> century."); The Edith Godden, 23 F. 43, 46
> (D.C.N.Y. 1885).  But see Usner, 400 U.S. at 497
> ("[Unseaworthiness arose] from its humble origin
> as a dictum in an obscure case in 1922 . . . ."
> (citing Carlisle Packing Co. v. Sandanger, 259
> U.S. 255 (1922))); Sieracki, 328 U.S. at 104
> (Stone, C.J., dissenting) ("[I]ndemnity for
> injuries resulting from unseaworthiness was first
> recognized by this Court in The Osceola.").

Wagner v. Kona Blue Water Farms, LLC, Civil No. 09-00600 JMS/BMK,

2010 WL 3566731, at *2 (D. Hawai'i Sept. 13, 2010).

To establish a claim for unseaworthiness, a plaintiff

must establish: "(1) the warranty of seaworthiness extended to

him and his duties; (2) his injury was caused by a piece of the

ship's equipment or an appurtenant appliance; (3) the equipment

used was not reasonably fit for its intended use; and (4) the

unseaworthy condition proximately caused his injuries."  Ribitzki

v. Canmar Reading & Bates, Ltd. P'ship, 111 F.3d 658, 664-65 (9th

Cir. 1997).

"[A] shipowner's liability for an unseaworthy vessel

extends beyond the members of the crew and includes a

longshoreman. . . ."  Usner, 400 U.S. at 497-98.  In Usner, the
court explained that the plaintiff's injuries were not caused by
the condition of the ship, its appurtenances, cargo, or crew,
"but the isolated, personal negligent act of the petitioner's
fellow longshoreman.  To hold that this individual act of
negligence rendered the ship unseaworthy would be to subvert the
fundamental distinction between unseaworthiness and negligence
that we have so painstakingly and repeatedly emphasized in our
decisions."  Id. at 500 (footnotes omitted).  Usner concluded
that it would be error "where no condition of unseaworthiness
existed, to hold the shipowner liable for a third party's single
and wholly unforeseeable act of negligence."  Id.

        In this case, Plaintiff was not injured by a vessel, a
piece of the ship's equipment, or an appurtenant appliance.
Rather, Plaintiff was injured while supervising the loading of a
truck with supplies to clean up a roadside oil spill.  The
Supreme Court examined "appurtenances" in Victory Carriers, Inc.
v. Law, 404 U.S. 202, 202-03 (1971), considering "whether state
law or federal maritime law governs the suit of a longshoreman
injured on a pier while driving a forklift truck which was moving
cargo that would ultimately be loaded aboard ship."  The Court
found that in that case, "the typical elements of a maritime
cause of action are particularly attenuated: [the longshoreman]
was not injured by equipment that was part of the ship's usual

gear or that was stored on board, the equipment that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank." Id. at 213-14.  In Victory Carriers, "the Supreme Court placed a substantive limitation on at least the shoreward reach of the seaworthiness remedy." Drachenberg v. Canal Barge Co., Inc., 571 F.2d 912, 919 (5th Cir. 1978)

Likewise, in the instant case, it is undisputed that the accident occurred somewhere at PENCO's warehouse near the pier, as opposed to on a gangplank or aboard a vessel. Plaintiff, therefore, cannot maintain a claim for unseaworthiness. See Parker v. South Louisiana Contractors, Inc., 537 F.2d 113 (5th Cir. 1976) (finding that a ramp permanently attached to dock was not an appurtenance of the vessel); cf. Drachenberg, 571 F.2d at 921 (concluding that dockside marine unloading arm "firmly and physically attached to the vessel" was an appurtenance thereof).

The Court therefore GRANTS PENCO's Motion as to Plaintiff's Count II unseaworthiness claim.

C.   **The Motion Is Denied as to Limitation of Liability**

Finally, PENCO moves for summary judgment on its affirmative defense of limitation of liability.  The Limitation Act provides:

39

(a) In general.--Except as provided in section
30506 of this title, the liability of the owner of
a vessel for any claim, debt, or liability
described in subsection (b) shall not exceed the
value of the vessel and pending freight.  If the
vessel has more than one owner, the proportionate
share of the liability of any one owner shall not
exceed that owner's proportionate interest in the
vessel and pending freight.

(b) Claims subject to limitation.--Unless
otherwise excluded by law, claims, debts, and
liabilities subject to limitation under subsection
(a) are those arising from any embezzlement, loss,
or destruction of any property, goods, or
merchandise shipped or put on board the vessel,
any loss, damage, or injury by collision, or any
act, matter, or thing, loss, damage, or
forfeiture, done, occasioned, or incurred, without
the privity or knowledge of the owner.

(c) Wages.--Subsection (a) does not apply to a
claim for wages.

46 U.S.C. § 30505.

The act is limited as follows:

(a) Application.--This section applies only to
seagoing vessels, but does not apply to pleasure
yachts, tugs, towboats, towing vessels, tank
vessels, fishing vessels, fish tender vessels,
canal boats, scows, car floats, barges, lighters,
or nondescript vessels.

(b) Minimum liability.--If the amount of the
vessel owner's liability determined under section
30505 of this title is insufficient to pay all
losses in full, and the portion available to pay
claims for personal injury or death is less than
$420 times the tonnage of the vessel, that portion
shall be increased to $420 times the tonnage of
the vessel.  That portion may be used only to pay
claims for personal injury or death.

(c) Calculation of tonnage.--Under subsection (b),
the tonnage of a self-propelled vessel is the
gross tonnage without deduction for engine room,

40

and the tonnage of a sailing vessel is the tonnage
for documentation.  However, space for the use of
seamen is excluded.

(d) Claims arising on distinct
occasions.--Separate limits of liability apply to
claims for personal injury or death arising on
distinct occasions.

(e) Privity or knowledge.--In a claim for personal
injury or death, the privity or knowledge of the
master or the owner's superintendent or managing
agent, at or before the beginning of each voyage,
is imputed to the owner.

46 U.S.C. § 30506.

First, as Plaintiff notes, the act applies "only to

seagoing vessels, but does not apply to pleasure yachts, tugs,

towboats, towing vessels, tank vessels, fishing vessels, fish

tender vessels, canal boats, scows, car floats, barges, lighters,

or nondescript vessels."  46 U.S.C. § 30506(a).  Although the

parties have not thoroughly briefed this issue, it appears that

the Boston Whalers, skiffs, jet skis, and tugboats that Plaintiff

worked on are excluded under this definition.  See Matter of

Talbott Big Foot, Inc., 854 F.2d 758, 761-62 (5th Cir. 1988)

("[T]he inquiry to determine whether a particular vessel is

'seagoing' . . . is whether the vessel does, or is intended to,

navigate in the seas beyond the Boundary Line in the regular

course of its operations.  These operations may in fact proceed

on either side of the Boundary Line; but the court must find

that, considering the design, function, purpose, and capabilities

of the vessel, it will be normally expected to engage in

41

substantial operations beyond the nautical boundary.").

In any event, even if a vessel does fall within the
ambit of the act, a question of fact remains as to the material
issue of whether or not the owner had privity or knowledge.

> Privity or knowledge exists where the owner has
> actual knowledge or could have and should have
> obtained the necessary information by reasonable
> inquiry or inspection.  This is basically a
> "reasonable man" test.  Moreover, for purposes of
> establishing privity or knowledge regarding
> limitation as to personal injury and death
> claimants, the privity or knowledge of the master
> of the vessel at or before the beginning of each
> voyage is deemed conclusively the privity or
> knowledge of the owner.  See 46 U.S.C. § 30506;
> see also Trico Marine Assets, Inc. v. Diamond B
> Marine Servs. Inc., 332 F.3d 779, 789-90 (5th Cir.
> 2003) ("[I]n situations resulting in loss of life
> or bodily injury, the knowledge of a seagoing
> vessel's master at the commencement of a voyage is
> imputed to the vessel's owner."); Pennzoil
> Producing Co. v. Offshore Exp., Inc., 943 F.2d
> 1465, 1473-74 (5th Cir. 1991) ("[A] shipowner has
> privity if he personally participated in the
> negligent conduct or brought about the unseaworthy
> condition.  Knowledge, when the shipowner is a
> corporation, is judged not only by what the
> corporation's managing officers actually knew, but
> also by what they should have known with respect
> to conditions or actions likely to cause the
> loss.")

In re Int'l Marine, LLC, 614 F. Supp. 2d 733, 740-41 (E.D. La.
2009).

Here, Plaintiff presented evidence regarding whether
the supervisors and vice presidents were present and directing
the manner of work being done at the time of the accident.
Plaintiff claims that supervisors and vice president and

Dave Carter were present at the time of the Plaintiff's injury. Ruben Sabog, Justin Souza and Jacob Darakjian were Plaintiff's supervisors and present and instructing Plaintiff as to the emergency response.  Further, the report of injury specifically says management was at fault for the accident and caused Plaintiff to hurry.  [Mem. in Opp. at 28 (citing Birnberg Decl., at ¶ 16 and Exh. N attached thereto (Cross Dep. 82:15-16)).] PENCO did not contest this evidence on summary judgment.  The Court FINDS that there is a triable issue of fact as to Defendants' privity and knowledge, thereby rendering summary judgment inappropriate.  The Motion is DENIED as to this issue.

## II.  **Motion on Complaint in Intervention**

PENCO also seeks summary judgment on Intervenor's First Amended Complaint in Intervention.  The Court first notes that on December 15, 2010, the magistrate judge issued an order that CIIC could intervene in this suit in order to "protect its rights to any recovery Plaintiff may obtain in this case."  [Order Granting Proposed Intervenor Insurance Company of the State of Pennsylvania's Motion for Order Granting Leave to Intervene, filed 12/15/10 (dkt. no. 39), at 12-13).]  The magistrate judge concluded that Plaintiff and Intervenor would seek recovery from the same fund, and therefore, Plaintiff would not adequately represent Intervenor's interests in this matter, and Intervenor was entitled to intervene as a matter of right.  [Id. at 10.]

The magistrate judge based his findings on the fact that CIIC was intervening in order to enforce its lien rights once Plaintiff received a settlement or award.

Turning to the Longshore Act, § 935 ("Substitution of carrier for employer") provides that the carrier may discharge "for such [insured] employer . . . such obligations and duties of the employer in respect of such liability, imposed by this Act." Section 933(h) ("Subrogation") provides that "[w]here the employer is insured and the insurance carrier has assumed the payment of the compensation, the insurance carrier shall be subrogated to all the rights of the employer." Sections 935 and 933(h) together provide that the carrier may step into the shoes of the employer it insures. Here, that employer is PENCO, as the Longshore employer. The Intervenor Longshore carrier is the party is enforcing its right to recover compensation and benefits, against a settlement or award to Plaintiff.

Section 903(e) provides "[n]otwithstanding any other provision of law, any amounts paid to an employee for the same injury, disability, or death for which benefits are claimed under this Act . . . shall be credited against any liability imposed by this Act." Section 933(f), provides "[i]f the [claimant] institutes proceedings . . . the employer shall be required to pay as compensation . . . a sum equal to the excess of the amount which the Secretary determines is payable on account of such

44

injury . . . over the net amount recovered against such third person." These sections allow the Longshore carrier to recover its lien for compensation paid, and receive a credit for future compensation the Longshore carrier may be obligated to pay, over and above the net amount of a plaintiff's settlement or award, preventing duplicative compensation. See <u>Taylor v. Bunge Corp.</u>, 845 F.2d 1323, 1327 (5th Cir. 1988) ("Thus the LHWCA creates a harmonious scheme, guaranteeing both that the exclusive remedy against the employer is the employee's action for statutory benefits, and that, in the event of a longshoreman's recovery against a third party, the employer's lien prevents double recovery."); <u>see also id.</u> at 1329 ("If we disallow the lien in cases such as this one, injured vessel employed longshoremen could easily word settlement agreements to avoid the employer's lien.").

The Court FINDS that the Intervenor Longshore carrier here seeks only to preserve its lien rights, and has the right to recover compensation and benefits paid in the event Plaintiff recovers against a third-party, including PENCO or its Jones Act carrier. The Motion on Complaint in Intervention is DENIED.

## CONCLUSION

On the basis of the foregoing, PENCO's Motion for Summary Judgment, filed on July 19, 2011 is HEREBY GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to Plaintiff's

Count II claim for unseaworthiness and DENIED in all other
respects.   PENCO's Motion for Summary Judgment on Complaint in
Intervention, filed on August 3, 2011, is HEREBY DENIED.

      IT IS SO ORDERED.

      DATED AT HONOLULU, HAWAII, November 29, 2011.



                 /S/ Leslie E. Kobayashi
                Leslie E. Kobayashi
                United States District Judge

**CEDRIC KAHUE V. PACIFIC ENVIRONMENTAL CORPORATION, ET AL; CIVIL
NO. 10-00001 LEK-KSC; ORDER (1) GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COMPLAINT IN
INTERVENTION**